1

2

3

4

5

6

7

8               UNITED STATES DISTRICT COURT

9               EASTERN DISTRICT OF CALIFORNIA

10                     ----oo0oo----

11

12   FELICIA THOMPSON, INDIVIDUALLY          No. 2:18-cv-02422 WBS KJN
     AND AS SUCCESSOR IN INTEREST OF
13   KEITH AUSTIN THOMPSON

14                  Plaintiff,             MEMORANDUM AND ORDER RE
                                           DEFENDANTS' MOTIONS FOR
15        v.                               SUMMARY JUDGMENT

16   NARINDER SAUKHLA, M.D.; RUTH
     PORTUGAL; SILOCHANA NAIDOO;
17   BRIAN BRIGGS; MONICA R. CORTEZ;
     ANDRES D. GALVAN; BETHLEHEM
18   HAILE, M.D.; et al.

19                  Defendants.

20

21                     ----oo0oo----

22        Plaintiff Felicia Thompson brought this action against

23   defendants Narinder Saukhla, M.D. ("Dr. Saukhla"), Ruth Portugal

24   ("Nurse Portugal"), and Brian Briggs ("Officer Briggs"),

25   individually and as the as successor-in-interest to her father,

26   decedent Keith Austin Thompson ("decedent" or "Thompson"),

27   seeking damages under 42 U.S.C. § 1983 for deliberate

28   indifference to a serious medical need in violation of the Eighth

                              1

Amendment, and alleging medical malpractice/professional negligence and wrongful death under California state law.[1] (See Second Amended Complaint ("SAC") (Docket No. 34).) Defendants now move for summary judgment on all claims except for plaintiff's state law claims against Dr. Saukhla. (See Def. Portugal's Mot. for Summ. J. ("Portugal MSJ") (Docket No. 81-1); Defs. Saukhla & Briggs Mot. for Summ. J. ("Saukhla & Briggs MSJ") (Docket No. 85).)

I.   Factual and Procedural Background

     This action arises out of the death of Keith Thompson, a 57-year-old inmate imprisoned at California Medical Facility Prison ("CMF") in Vacaville, California, in the early hours of September 3, 2017. (See Saukhla & Briggs Statement of Undisputed Facts ("Saukhla & Briggs SUF") No. 1 (Docket No. 83-1).) Thompson suffered from several ongoing health conditions prior to his death, including type II diabetes, chronic kidney disease, glaucoma, and HIV. (See Decl. of Diana Esquivel ("Esquivel Decl."), Ex. D, Record Review Report of Dr. Dan L. Field ("Field Report") at 3 (Docket No. 83-3).)

---

[1]   Plaintiff's original complaint alleged generally the same claims as the operative complaint, but named other defendants, who have since been dismissed. (See Compl. (Docket No. 1); Docket Nos. 28, 32, 78, 86.) The operative complaint also names two other successors-in-interest to Thompson, Kibriyaa Taajwar (f/k/a Keith Thompson, Jr.) and Austin Shuntay Williams, as defendants pursuant to California Code of Civil Procedure § 382, because plaintiff has been unable to ascertain whether they choose to participate in the action. See Cal. Code Civ. P. § 382; (SAC ¶¶ 8-9). Though Taajwar and Williams are named as nominal defendants, plaintiff does not assert any actual claims or seek any relief from them. In reality, they are plaintiffs. See Hall v. Superior Ct., 108 Cal. App. 4th 706, 715 (2d Dist. 2003).

In the week leading up to his death, evidence shows that Thompson began feeling unwell, such that he was unable to work in his position as the chairman of the Men's Advisory Council at CMF. (Pl.'s Resp. to Defs. Saukhla & Briggs Statement of Undisputed Facts ("Pl.'s Resp. to Saukhla & Briggs SUF") No. 43 (Docket No. 89).) On the afternoon of September 2nd, temperatures at CMF exceeded 110 degrees Fahrenheit. (Id. at No. 44). Evidence shows that, around 4:30 p.m. that day, Thompson began to act incoherently and appear noticeably ill and weak. (Id. at No. 45.) Witnesses describe him as slurring his words and expressing confusion as to where he was. (Id. at Nos. 45-46.) Thompson asked his bunkmate, Melvin Smith, to help him cool off in the dorm's shower. (Id. at No. 45.) Thompson stated that he wanted to keep his clothes on in the shower, and said he was ready to go "man down," a general term used in the prison context to describe a situation where an inmate needs to be seen in the prison emergency room as quickly as possible. (Id. at Nos. 34, 45; Index of Exs. in Support of Portugal Mot. for Summ. J., Ex. 12 ("Portugal Dep.") 34:10-25 (Docket No. 81-3).)

Because it was well-known that the dorm's showers only produced hot water, and due to Thompson's erratic behavior, a correctional officer, Cortez, was summoned. (Id. at Nos. 46-47.) Immediately upon seeing Thompson, Officer Cortez radioed for a "man down." (Id.) (Portugal Statement of Undisputed Facts ("Portugal SUF") No. 12 (Docket No. 81-2).)

Nurse Portugal, who was working in CMF's treatment and triage area ("TTA") that day, responded to the man down call, arriving at the dorm at approximately 4:50 p.m. (Portugal SUF

3

Nos. 3, 13; Pl.'s Resp. to Saukhla & Briggs SUF No. 47; Index of Exs. in Support of Portugal Mot. for Summ. J., Ex. 2 ("Portugal Decl.") ¶¶ 9-10.)  Because of the heat, Nurse Portugal immediately transported Thompson back to the TTA and adjacent "B-1 clinic," conducting an initial assessment of Thompson as she went.  (See Pl.'s Resp. to Saukhla & Briggs SUF No. 47; Portugal Decl. ¶¶ 9-10; Index of Exs. in Support of Portugal Mot. for Summ. J., Ex. 3 ("Thompson Initial Assessment").)  Nurse Portugal recorded Thompson's chief complaint as "exhaustion."  (See Thompson Initial Assessment.)

Upon arriving at the B-1 clinic, at 5:04 p.m., Nurse Portugal performed at full assessment of Thompson.  (See Index of Exs. in Support of Portugal Mot. for Summ. J., Ex. 4 ("TTA Flow Sheet").)  She recorded a generally normal review of Thompson's systems, but noted that his respiration was "slightly" rapid, that he appeared drowsy (though oriented), and that his right pupil was not reactive to light. (Portugal Dep. 41:20-46:20; TTA Flow Sheet.)  Nurse Portugal further recorded a body temperature of 96.5 degrees Fahrenheit and a Glasgow Coma Scale ("GCS") score--a measure of responsiveness involving the eye, verbal, and muscular response levels--of 15/15 (a perfect score).  (TTA Flow Sheet; Portugal Dep. 44:10-23, 53:24-54:2.)

At this point, plaintiff's and defendants' accounts of events begin to diverge.  Nurse Portugal contends that, although he was alert and oriented, Thompson refused to answer her questions regarding his history and his complaints.  (See Portugal Decl. ¶ 9.)  Nurse Portugal noted that Thompson had a history of glaucoma, and concluded that his pupil reaction was

therefore not unusual.  (See id. at ¶ 12.)  Because Thompson followed commands by assisting medical staff in transferring him from the gurney to the bed in the TTA, responded to questions about his pain levels by asking for pain medication, and complied with requests to open his eyes, Nurse Portugal concluded that Thompson's lack of response was voluntary, and inferred from his drowsiness that his chief complaint was "heat exhaustion," though Thompson had not explicitly stated that he was feeling too hot or that he was suffering from heat exhaustion.  (See id. at ¶¶ 9-11; TTA Flow Sheet; Portugal Dep. 39:10-41:19.)

Plaintiff contends that Thompson was not voluntarily refusing to answer Nurse Portugal's questions--rather, Thompson's responses of "let me sleep" or "leave [me] be" were indications that Thompson was still experiencing the changes to his mental status that had led officers in his dorm to call "man down" in the first place.  (See Pl.'s Resp. to Portugal SUF Nos. 14.) Though there is no evidence in the record that Nurse Portugal was ever informed of Thompson's behavior at the dorm, or that he had been feeling sick for the past week, another inmate who was present at the B-1 clinic, Earl Miller, testified that upon Thompson's arrival, Thompson "at times . . . didn't know . . . where he was at" and that "sometimes he looked at me like he didn't know me, and then an hour or so later, he would call me by name."  (Index of Exs. in Support of Pl.'s Opp'n at 118 ("Miller Dep.") 36:9-19.)

Plaintiff's expert, Dr. Field, contends that the behavior described by Miller, along with symptoms that Nurse Portugal's herself noted--that Thompson was having difficulty

moving on his own, that his eyes were initially closed, that his
pupil was not reactive to light, and that he was not responsive
to questioning--is more consistent with a GCS score as low as 9,
which would represent a true medical emergency in this setting.
(Pl.'s Resp. to Saukhla & Briggs SUF No. 53.)

Nurse Portugal continued to monitor Thompson's vital
signs over the course of the next several hours, until Thompson
was discharged from the clinic. (See TTA Flow Sheet.) In all,
Nurse Portugal collected six sets of vital signs at 5:05 p.m.,
5:15 p.m., 6:30 p.m., 7:00 p.m., 8:00 p.m., and 9:00 p.m. (See
id.) Over the course of four hours, Thompson's vitals remained
relatively stable and, if anything, appeared to improve: his
pulse decreased from 118 to 94, his temperature remained
approximately 96.5 degrees, his blood pressure decreased from
144/72 to 120/67, and his respiration remained relatively
constant at 22 breaths/minute. (See id.) While the other
inmate, Miller, testified that Thompson complained to nursing
staff that he was having trouble breathing (Miller Dep. 37:8-
38:9), Thompson's blood-oxygen saturation was measured at 100%
throughout his stay in the clinic. (Id.)

Because Thompson had been complaining of "10/10" pain
in his back, Nurse Portugal gave Thompson water and Tylenol at
approximately 6:00 p.m. (Id. at 2; Portugal Dep. 47:5-50:25.)
She also performed a finger-stick blood sugar test at
approximately 6:30, which returned a normal value. (Id.)

At approximately 6:50 p.m., Nurse Portugal called Dr.
Saukhla, the on-call doctor for the TTA and the B-1 clinic.
(Portugal SUF No. 18; Saukhla & Briggs SUF Nos. 2, 7.) Nurse

Portugal informed Dr. Saukhla that Thompson had gone man down for "exhaustion" and conveyed Thompson's vital signs, which reflected Thompson's temperature of 96.5 degrees and slightly elevated blood pressure, pulse, and respiration rate. (Saukhla & Briggs SUF No. 8; Portugal Dep. 72:21-73:6.) She also provided Dr. Saukhla with a list of Thompson's existing medical conditions. (See Esquivel Decl., Ex. C ("Thompson Med. Records") at 13.) Nurse Portugal further informed Dr. Saukhla that she had given Thompson Tylenol for his back pain and that he had drank three to four cups of water. (Saukhla & Briggs SUF No. 8.) Nurse Portugal did not inform Dr. Saukhla that Thompson had been complaining about shortness of breath or that he had been having trouble breathing, but did inform him that Thompson's blood oxygen level was 100%. (Id. at No. 16; Thompson Med. Records at 13.) No evidence in the record suggests that Nurse Portugal informed Dr. Saukhla that Thompson was unable or unwilling to answer her questions or that he was experiencing signs of an altered mental state. (Saukhla & Briggs SUF No. 16.)

Dr. Saukhla was aware that it had been a particularly hot day and that other inmates had been seen in the TTA and the B-1 clinic for complaints of exhaustion due to dehydration. (Saukhla & Briggs SUF No. 8.) Based on this information and the information Nurse Portugal provided, Dr. Saukhla considered the possibility that Thompson's complaints of exhaustion were "secondary" to the heat (i.e., that they were caused by the heat and not by some other underlying condition), and ordered that Nurse Portugal observe Thompson for 45-60 minutes and provide him plenty of fluids orally. (Id. at No. 10.) Dr. Saukhla did not

further inquire with Nurse Portugal to see if Thompson had exhibited any mental status changes. (Pl.'s Resp. to Saukhla & Briggs SUF No. 10.)

Plaintiff's expert witness, Dr. Field, contends that had Dr. Saukhla inquired as to Thompson's mental status and had Nurse Portugal informed Saukhla of the symptoms Thompson was exhibiting, Thompson's need for emergency medical attention would have become clear at this time. (Id.) Plaintiff also contends that Nurse Portugal could not have accurately conveyed how much water Thompson had drunk at that point because she was not actively monitoring Thompson's water intake. (See id.) While Nurse Portugal testified that she gave Thompson a pitcher of water to drink, one of the inmate janitors at the B-1 clinic, Crumwell, provided a sworn declaration that he had to bring Thompson a container of ice water because he did not have any and was asking for water. (Pl.'s Index of Exs. in Support of Pl.'s Opp'n at 19 ("Crumwell Decl.") (Docket No. 90).) Crumwell also stated that he had to lift Thompson up into a sitting position to drink because he was unable to sit up on his own. (Id.)

Nurse Portugal continued to monitor Thompson and called Dr. Saukhla two more times before Thompson was discharged. (Saukhla & Briggs SUF Nos. 13-17; Portugal SUF Nos. 21-28.) Dr. Saukhla noted Thompson's vital signs and, based on the information Nurse Portugal provided him, instructed her to continue monitoring Thompson, give him dinner, and ensure he drank plenty of fluids. Nurse Portugal's notes indicate that Thompson ate 10-15% of his meal and that he was "resting comfortably" during this time. (Id.) However, Crumwell, the

inmate janitor, stated that he had to assist Thompson in using the restroom and that Thompson was unable to feed himself when Crumwell brought him food. (Crumwell Decl. at 2.) Crumwell does not specify whether this food was in addition to the food Nurse Portugal says Thompson ate. (See id.) Another inmate in the clinic, Earl Miller, observed that, when a nurse brought Thompson his food, Thompson told her he could not eat anything. (Index of Exs. in Support of Pl.'s Opp'n at 12 ("Miller Decl.").) Because Thompson continued to report his back pain as a 10/10, Nurse Portugal administered Tylenol No. 3--Tylenol with codeine-- pursuant to a physician's standing order (an order which permits Nurse Portugal to administer the medication whenever certain conditions are met). (Portugal SUF No. 24; Portugal Decl. ¶ 18.)

By 9:41 p.m., when Nurse Portugal and Dr. Saukhla had their third call, defendants' contention is that Thompson indicated that he was feeling better and that his back pain had lessened to a 3/10. (See Saukhla & Briggs SUF No. 16; Thompson Med. Records at 13.) Because Thompson's vitals appeared to have trended towards normalcy (Thompson Med. Records at 13; Portugal Decl. ¶¶ 13, 19), Dr. Saukhla concluded that Thompson's dehydration had resolved, and ordered Nurse Portugal to encourage Thompson to continue to drink fluids and to return Thompson to his dorm. (Portugal SUF No. 28; Saukhla & Briggs SUF No. 15.)

Officer Briggs arrived at the B-1 clinic to escort Thompson back to his dorm at approximately 11:00 p.m. (Saukhla & Briggs SUF No. 18.) When Briggs arrived, Thompson was still in his bed. (Id. at No. 19.) Plaintiff offers witness testimony indicating that, by the time Thompson was set to leave the clinic

9

with Officer Briggs, his condition had not improved and that, in fact, he was still too weak to stand on his own or move from his bed to a wheelchair, and was still complaining that he was having trouble breathing (though records indicate that his oxygen saturation levels were still at 100%). (See Crumwell Decl.; Miller Dep. 37:8-45:9; Miller Decl.; TTA Flow Sheet.)

Another nurse in the clinic, Nurse Joseph, informed Officer Briggs that Thompson was ready to go back to his housing unit and had already been cleared by medical staff. (Saukhla & Briggs SUF at No. 19.) Briggs asked Thompson if he was ready to go, and Thompson replied "Yes Briggs, I'm ready to go," or words to that effect. (Id. at No. 20.) Briggs contends that when he escorted Thompson back to his room, Thompson seemed fatigued, as if he had been tired, but was coherent. (Id. at No. 75; Saukhla & Briggs SUF No. 21.) Briggs states that he was able to have a full conversation with Thompson about Thompson's release date, sports, and children. (Id.)

Plaintiff contends that Thompson was continuing to experience mental status changes as Briggs escorted him back to the dorm. (See Pl.'s Resp. to Saukhla & Briggs SUF No. 21-22.) Miller noted that, as Thompson was being wheeled out of the clinic, he was not talking or looking around. (Id. at No. 60.) Plaintiff points out that even Briggs' account--which describes Briggs as moving slowly to ensure Thompson did not fall out of his chair--implies that Thompson was having trouble staying upright. (Id.) Multiple inmate witnesses reported that Thompson was sliding out of his wheelchair and was still noticeably unwell upon his return to the dorm. (Id. at No. 78.) One witness

stated that Thompson began rattling off numbers and saying that someone was after him. (Index of Exs. in Support of Pl.'s Opp'n at 7 ("Smith Decl.").)

Within 10-15 minutes of arriving at his dorm, Thompson went "man down" for a second time, and was taken back to the TTA on a gurney. (Id. at No. 77; Saukhla & Briggs SUF Nos. 23-25.) At approximately 11:30, Nurse Joseph called Dr. Saukhla and informed him that Thompson was not talking and was exhibiting loss of consciousness. (Saukhla & Briggs SUF No. 26.) Nurse Joseph also informed him that Thompson's temperature was 96.8, his blood pressure and pulse had decreased, and that he was cold, clammy, and drowsy. (Id.) Dr. Saukhla ordered that IV fluids be administered and that Thompson be transferred to VacaValley Hospital for a higher level of care. (Id.) Thompson died a few hours later, in the early hours of September 3, 2017, at VacaValley Hospital. (Id.)

Plaintiff's expert, defendants Saukhla and Briggs' expert, and the Solano County Coroner all came to different conclusions regarding the cause of Thompson's death. The Solano County Coroner performed an autopsy shortly after Thompson's death, and concluded that the cause of death was acute mixed drug intoxication based on his observation of elevated levels of chlorpheniramine (a mild decongestant) and opiates in his blood. (Index of Exs. in Support of Saukhla & Briggs Mot. Summ. J., Ex. 21 ("Vilke Dep.") 20:6-23; Index of Exs. in Support of Pl.'s Opp'n at 166 ("Field Dep.") 35:23-36:22.) Defendants' expert, Dr. Vilke, disagreed with this conclusion, and instead found that Thompson's death was caused by "hyperkalemia," or elevated

potassium levels, due to kidney failure. (Vilke Dep. 18:16-20:23.) These elevated potassium levels caused Thompson to suffer a heart attack, which caused his death. (Id.)

Plaintiff's expert, Dr. Field, also disagreed with the coroner's conclusion that Thompson died from acute mixed drug intoxication. Dr. Field instead concluded that Thompson likely died from sepsis leading to multiorgan failure and cardiac arrest. (Field Report at 11.) Dr. Field contends that, when Thompson first presented to the B-1 clinic, his vital signs displayed 3 out of the 4 criteria for Systemic Inflammatory Response Syndrome ("SIRS"), a deadly condition in which the body is under attack. (Field Report at 10; Index of Exs. in Support of Pl.'s Opp'n, at 1 ("Field Rebuttal Report").) When combined with an infection, SIRS becomes sepsis, the life-threatening condition that Dr. Field contends Thompson ultimately died from. (Field Rebuttal Report

The key vital sign that Dr. Field focuses on is Thompson's temperature--Dr. Field contends that Dr. Saukhla should have recognized the possibility that Thompson was suffering from SIRS based on his temperature of 96.5 degrees, which Dr. Field states is hypothermic in the SIRS context and inconsistent with Dr. Saukhla's diagnosis of heat illness. (Field Report at 10-11.) Dr. Field concludes that, because Thompson was suffering from symptoms of SIRS and was hypothermic, Dr. Saukhla's failure to inquire further into the possibility that Thompson was exhibiting mental status changes and his failure to transfer Thompson to an emergency medical setting fell below the standard of care and constituted deliberate

indifference to Thompsons' well-being.  (Field Rebuttal Report at 2.)

II.  <u>Analysis</u>

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party moving for summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact and can satisfy this burden by presenting evidence that negates an essential element of the non-moving party's case. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).

Alternatively, the movant can demonstrate that the non-moving party cannot provide evidence to support an essential element upon which it will bear the burden of proof at trial. <u>Id.</u>  If the moving party has properly supported its motion, the burden shifts to the non-moving party to set forth specific facts to show that there is a genuine issue for trial.  <u>See</u> <u>id.</u> at 324. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." <u>Matsuhita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).  Any inferences drawn from the underlying facts must, however, be viewed in the light most favorable to the party opposing the motion.  <u>See</u> <u>id.</u>

A.   <u>Plaintiff's § 1983 Claims for Deliberate Indifference under the Eighth Amendment</u>

Plaintiff's operative complaint states a § 1983 claim under the Eighth Amendment against all three defendants.  (<u>See generally</u> SAC.)  To establish a violation of the Eighth Amendment

13

due to inadequate medical care, a plaintiff must establish that the alleged inadequacy rises to the level of "deliberate indifference to serious medical needs." Estell v. Gamble, 429 U.S. 97, 106 (1976). In the Ninth Circuit, the test for deliberate indifference consists of two parts. See Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006). "First, the plaintiff must show a 'serious medical need' by demonstrating that 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.'" Id. (quoting WMX Techs., Inc. v. Miller, 104 F.3d 1133, 1096 (9th Cir. 1997)). Second, the plaintiff must show that "the defendant's response to the need was deliberately indifferent." Id.

All three defendants assert the defense of qualified immunity from suit on plaintiff's § 1983 claim. The doctrine of qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009)(citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).) To determine whether an official is entitled to qualified immunity, the court considers: (1) whether there has been a violation of a constitutional right; and (2) whether the official's conduct violated "clearly established" federal law. Sharp v. Cnty. of Orange, 871 F.3d 901, 909 (9th Cir. 2016) (citing Kirkpatrick v. Cnty. Of Washoe, 843 F.3d 784, 788 (9th Cir. 2016)).

Qualified immunity is a question of law to be decided

14

by the court.  See Hunter v. Bryant, 502 U.S. 224, 228 (2009).
Qualified immunity attaches when an official's conduct does not
violate clearly established statutory or constitutional rights of
which a reasonable person would have known.  See Kisela v.
Hughes, 138 S. Ct. 1148, 1152 (2018) (internal citations
omitted).  Although the Supreme Court has established that the
case law does not require a case to be directly on point for a
right to be clearly established, existing precedent must have
placed the statutory or constitutional question beyond debate.
See White v. Pauly, 137 S. Ct. 548, 551 (2017).  The Supreme
Court has also made clear that clearly established law should not
be defined at a high level of generality.  See Kisela, 138 S. Ct.
at 1152.  The plaintiff bears the burden of "proving that the
right allegedly violated was clearly established at the time of
the official's allegedly impermissible conduct."  Camarillo v.
McCarthy, 998 F.2nd 638, 640 (9th Cir. 1993).

Qualified immunity applies to cases brought under the
Eighth Amendment the same as it does to cases brought for
violations of rights provided by other amendments, such as the
Fourth Amendment.  See Estate of Ford v. Ramirez-Palmer, 301 F.3d
1043, 1049 (9th Cir. 2002).  It is obvious, however, that the
analysis in an Eighth Amendment case for deliberate indifference
to a serious medical need is different than in an excessive force
case, or even a detention or arrest case, under the Fourth
Amendment.  Because the Eighth Amendment inquiry asks whether a
prison official has deliberately ignored the serious medical need
of an inmate, one might speculate as to whether qualified
immunity is appropriate at all, as it is somewhat difficult to

imagine scenarios in which a reasonable official could think it was reasonable to be deliberately indifferent to a substantial risk of serious harm.  Indeed, in <u>Hamilton v. Endell</u>, 981 F.2d 1062, 1066 (9th Cir. 1992), the Ninth Circuit held that a "finding of deliberate indifference necessarily precludes a finding of qualified immunity" for this very reason.

However, just ten years after deciding <u>Hamilton</u>, the Ninth Circuit reversed course and held in <u>Estate of Ford</u> that the Supreme Court's intervening decision in <u>Saucier v. Katz</u>, 533 U.S. 194 (2001) had effectively overruled <u>Hamilton</u>.  <u>Estate of Ford</u>, 301 F.3d 1049.  In <u>Saucier</u>, the Ninth Circuit had held that qualified immunity was inappropriate in an excessive force case because the constitutional inquiry--whether unreasonable force was used in making the arrest--and the inquiry on qualified immunity were the same.  <u>Saucier</u>, 533 U.S. at 202.  The Supreme Court reversed, observing that the goal of qualified immunity would be undermined if summary judgment were denied every time a material issue of fact remains on an excessive force claim, and holding that the qualified immunity inquiry therefore must be analyzed separately from the constitutional inquiry.  <u>Id.</u>

<u>Estate of Ford</u> made clear that the principle espoused in <u>Saucier</u> applies in the Eighth Amendment context as well.  <u>See</u> <u>Estate of Ford</u>, 301 F.3d at 1049.  Qualified immunity must be analyzed separately from the inquiry of whether an official has exhibited deliberate indifference to a serious medical need, because "the qualified immunity inquiry 'has a further dimension'"--the clearly-established law inquiry.  <u>Id.</u> (quoting <u>Saucier</u>, 533 U.S. at 205).  This inquiry recognizes that "it is

often difficult for an officer to determine how the relevant legal doctrine will apply to the factual situation that he faces," and, therefore, "all but the plainly incompetent or those who knowingly violate the law" have immunity from suit. Id. "If the law at the time of an alleged violation did not clearly establish that the specific situation faced by an officer was sufficiently serious, 'a reasonable prison official understanding that he cannot recklessly disregard a substantial risk of serious harm, could know all of the facts yet mistakenly, but reasonably, perceive that the exposure in any given situation was not that high.'" Sandoval v. Cnty. of San Diego, 985 F.3d 657, 672 (9th Cir. 2021) (quoting Estate of Ford, 301 F.3d at 1050). In such a circumstance, the official would be entitled to qualified immunity even though he had, in fact, been deliberately indifferent to what turned out to be a substantial risk of serious harm. See id.

Accordingly, the court must analyze whether defendants are entitled to qualified immunity in the same manner it would in a Fourth Amendment or any other context. The court has the discretion to analyze the "clearly established law" prong of the qualified immunity analysis first, and, if analysis of that prong proves dispositive, the court need not analyze the other. See Pearson, 555 U.S. at 236. According to the Ninth Circuit, the "dispositive inquiry" in the clearly-established analysis is "'whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted,' based on the law at the time." Sandoval, 985 F.3d at 672 (quoting Estate of Ford, 301 F.3d at 1050).

1          1.   Nurse Portugal

2          Plaintiff has not met her burden of demonstrating that

3     it would have been clear to a reasonable officer in Nurse

4     Portugal's position that her conduct was unlawful.  Plaintiff

5     argues that, in the Ninth Circuit, it has been clearly

6     established that prison officials violate the Constitution when

7     they "deny, delay or intentionally interfere" with needed medical

8     treatment.  See Jett, 439 F.3d at 1096; Sandoval, 985 F.3d at

9     679.  The strongest case plaintiff offers in support of this

10    contention is Sandoval, which involved two separate holdings that

11    the conduct of three nurses did not warrant the application of

12    qualified immunity.

13         First, in Sandoval, the Ninth Circuit held that a jail

14    nurse was not entitled to qualified immunity for failure to

15    provide constitutionally adequate medical care where evidence

16    submitted by the plaintiff showed that the nurse had "fail[ed] to

17    provide any meaningful treatment to an inmate who was sweating

18    and appeared so tired and disoriented that a deputy urged that he

19    be re-evaluated."  Id. at 680.  Despite being told by a sheriff's

20    deputy that the inmate was shaking, tired, disoriented, and

21    needed to be looked at more thoroughly, the nurse merely

22    administered a duplicative, "very quick" blood sugar test, and

23    then failed to check on the detainee--who was obviously

24    exhibiting drug withdrawal symptoms and was visibly shaking--for

25    six hours, though his cell was only located 20 feet away.  Id.

26    Second, the Ninth Circuit held that two other jail nurses were

27    not entitled to qualified immunity where the evidence showed that

28    they delayed calling paramedics for over 40 minutes upon finding

an inmate who had collapsed to the ground and was completely
"unresponsive and having a seizure or 'seizure-like activity.'"
Id. at 663.

Sandoval is so factually distinguishable that it could
not have placed a reasonable nurse in Portugal's position on
notice that her conduct was unlawful.  Undisputed evidence shows
that Nurse Portugal responded to the initial "man down" call from
Thompson's dorm, transported him back to the B-1 clinic,
attempted to evaluate the cause of his symptoms, measured his
vital signs, administered pain medication in response to his
requests, communicated with Dr. Saukhla, the on-call physician,
on three separate occasions, and carried out the treatment plan
formulated by Dr. Saukhla, ultimately measuring Thompson's vital
signs six times over approximately four hours before sending
Thompson back to his dorm on Dr. Saukhla's orders.  (See Pl.'s
Resp. to Portugal SUF Nos. 12-28; TTA Flow Sheet.)  While
plaintiff raises factual disputes as to whether Nurse Portugal
adequately monitored Thompson's fluid intake, or accurately
reported how much he ate, the picture of Nurse Portugal's care
that arises from the undisputed evidence is a far cry from simply
administering one "quick 10-second blood test" while otherwise
ignoring an inmate in obvious need of help for hours on end.  See
Sandoval, 985 F.3d at 680.

Nor is plaintiff's argument that Nurse Portugal "failed
to accurately assess and observe that Mr. Thompson was
experiencing symptoms of mental status changes" persuasive.  (See
Pl.'s Resp. to Portugal SUF No. 14.)  At best, this is nothing
more than a disagreement with the medical conclusion Nurse

Portugal came to after attempting to assess plaintiff's mental state on the way to and at the B-1 clinic.  It is true that the Ninth Circuit has held that prisoners have the right to be free from a "course of treatment that is medically unacceptable under the circumstances."  Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996).  However, the Ninth Circuit has also made clear that this does not mean that every disagreement over medical treatment rises to the level of a constitutional violation--the state official must also have chosen that course of treatment in conscious disregard of an excessive risk to the decedent's health.  See id.; Sandoval, 985 F.3d at 680 ("We emphasize that this is not a case where a nurse mistakenly diagnosed a patient after reasonably attempting to ascertain the cause of unexplained symptoms.").

Plaintiff does not provide any evidence that Nurse Portugal purposefully or consciously avoided evaluating Thompson's mental state.  Rather, the undisputed evidence shows that Nurse Portugal followed CMF policy by asking Thompson questions regarding his complaints and performing a GCS evaluation in order to assess his mental status.  (See Pl.'s Resp. to Portugal SUF Nos. 14, 15, 18; Pl.'s Resp. to Saukhla & Briggs SUF Nos. 38, 40.)  The undisputed evidence further shows that, because Thompson answered at least some of Nurse Portugal's questions--by asking her to let him sleep, indicating that his back hurt, and stating that he wanted pain medication--and complied with her verbal commands, Nurse Portugal ultimately concluded that Thompson's failure to answer some of her questions was not clinically significant.  (See Pl.'s Resp. to Portugal SUF

Nos. 14, 15, 18.)  Nurse Portugal's expert witness, Nancy Booth, R.N., opined that Nurse Portugal's assessment that Thompson was voluntarily refusing to respond to her initial inquiries was reasonable under the circumstances and within the standard of care for a nurse in a correctional setting.  (Index of Exs. in Support of Portugal MSJ, Ex. 20 ("Booth Decl.") ¶ 17 (Docket No. 81-3).)

Plaintiff counters that, even if there is no direct evidence that Nurse Portugal consciously ignored Thompson's mental status changes, the fact that those mental status changes were obvious to other eyewitnesses would allow a jury to conclude that Nurse Portugal did consciously pursue a course of treatment that posed an excessive risk to Thompson's health by failing to adequately describe those changes to Dr. Saukhla or escalate Thompson's care to an emergency medical setting.  See (Field Report at 8); Farmer v. Brennan, 511 U.S. 825, 842 (1970) (noting that a jury may infer a prison official's knowledge of a substantial risk "from the very fact that the risk was obvious").

However, plaintiff points to no clearly established law requiring a nurse to call 9-1-1 or alert a physician based on the types of mental status changes observed by witnesses in this case--occasionally appearing confused as to where one is, slurring one's words, babbling, and failing to remember other inmate's names.  A reasonable official in Nurse Portugal's position would simply not have concluded that failing to alert a doctor or call an ambulance to transport Thompson to the emergency room presented the same risk of harm as failing to call a paramedic for an inmate who is completely unconscious and

actively seizing on the floor of a jail cell, especially considering the fact that Thompson was already located in a clinical (albeit not an emergency) setting and was already being treated by a physician.  See Sandoval, 985 F.3d at 680.

The reasonableness of Nurse Portugal's conduct is further evidenced by the testimony of her expert witness, Nancy Booth.  After a full review of the record--including the written declarations and depositions of eyewitnesses at the facility--Ms. Booth concluded that nothing in Thompson's presentation should have led Portugal to believe that Thompson was suffering from a more serious illness that required emergent care.  (See Booth Decl. ¶ 19.)  Though plaintiff's expert, Dr. Field, disagrees, the fact that a qualified expert opined that Nurse Portugal's course of treatment was medically acceptable under the circumstances supports the conclusion that a reasonable nurse in Portugal's position would not have known that her course of treatment violated the law.  See Jackson, 90 F.3d at 332.  Nurse Portugal is therefore entitled to qualified immunity as to plaintiff's § 1983 claim for deliberate indifference under the Eighth Amendment.

2.  Dr. Saukhla

Plaintiff has also failed to meet her burden of demonstrating that law was clearly established such that a reasonable physician in Dr. Saukhla's position would have known that his conduct was unlawful.  Plaintiff again cites to Jackson for the proposition that Thompson "had a clearly established right to be free from a course of treatment that is medically unacceptable under the circumstances."  Jackson, 90 F.3d at 332.

However, as noted above, the Ninth Circuit has made it clear that a mere "difference of medical opinion" does not, by itself, establish a violation of the Eighth Amendment.  Id.  In other words, the fact that a doctor misdiagnoses a patient or provides him with medically unacceptable treatment does not turn a claim of malpractice into an Eighth Amendment claim simply because the patient is a prisoner.  See Broughton v. Cutter Labs., 622 F.2d 458, 460 (9th Cir. 1980).  To violate clearly established law, the defendant must have chosen the medically unacceptable course of treatment in conscious disregard of an excessive risk to the patient's health.  See Jackson, 90 F.3d at 332.

In Jackson, the Ninth Circuit held that the physician defendants were not entitled to qualified immunity at the motion to dismiss stage because the plaintiff had adequately alleged that the defendants denied him the opportunity for a kidney transplant not because of an honest medical judgment, but "on account of personal animosity."  Id.  Here, plaintiff has presented no evidence, and does not even appear to argue, that Dr. Saukhla acted pursuant to any personal animosity toward Thompson.

Rather, plaintiff relies on the testimony of her expert, Dr. Field, to argue that Dr. Saukhla deliberately ignored the possibility that Thompson was experiencing mental status changes. (See Field Report at 4, 10.)  Dr. Field faults Dr. Saukhla for "failing to inquire about Mr. Thompson's true mental status."  Id.  Because Thompson "met SIRS criteria, signifying a potentially lethal condition, based on his abnormal vital signs alone," Dr. Field opines that Dr. Saukhla should have asked Nurse

Portugal additional questions regarding Thompson's mental status
to appropriately determine whether transport to emergency care
was necessary. (Field Report at 10-11.) Dr. Field further
argues that Dr. Saukhla should have asked about Thompson's mental
status even under his diagnosis of heat illness with dehydration,
and that under this diagnosis, there were additional tests Dr.
Saukhla should have ordered, including orthostatic evaluation and
IV fluids. (Id.) Again, this argument presents little more than
a difference of medical opinion. See Jackson, 90 F.3d at 332.
There is a fundamental difference between not doing something the
doctor should have done and acting with deliberate indifference.

Dr. Saukhla's expert, Dr. Vilke, testified that
Thompson's vital signs could have been indicative of dehydration
as a result of heat exhaustion, and that his low body
temperature, while on the lower end of what is normal, was not
necessarily indicative of a more serious medical condition.
(Vilke Dep. 31:21-37:17.) He further testified that, based on
the information Nurse Portugal provided Dr. Saukhla, Dr.
Saukhla's inquiry into the circumstances surrounding Thompson's
need to go "man down" and Dr. Saukhla's chosen course of
treatment were medically reasonable. (Vilke Dep. 33:17-34:10;
68:4-69:11.)

Plaintiff presents no evidence that Dr. Saukhla was
ever made aware of information from which he could infer that
Thompson was experiencing altered mental status or a continued
serious medical need warranting transfer to a higher level of
care. Dr. Field even conceded in his deposition that nothing in
the medical records suggested that Dr. Saukhla was ever informed

by Nurse Portugal that Thompson was not responding, that he was babbling, or that he had any sort of altered mental status. (Field Dep. 119:8-123:19.)

The undisputed evidence instead shows that Dr. Saukhla considered Thompson's body temperature, as well as all of his other vital signs, and ultimately concluded that Thompson was likely suffering from heat exhaustion. (See Saukhla & Briggs SUF Nos. 10-12.) Plaintiff does not point to any clearly established law indicating that a physician has violated the Eighth Amendment when he attempts, in good faith, to diagnose a patient's condition and, based on this diagnosis, chooses a course of treatment that, while ultimately wrong, is medically acceptable to at least some well-qualified members of the profession. See Jackson, 90 F.3d at 332.

This is not a case like Jett, where a doctor purposefully delayed setting and casting an inmate's fractured thumb for six months, despite acknowledging that this course of treatment was required to alleviate the inmate's pain and avoid permanent disfigurement. See Jett, 439 F.3d at 1096. In this case, there is simply no evidence suggesting that Dr. Saukhla "consciously disregarded" a substantial risk of harm resulting from Thompson's altered mental status that would have been "obvious" to a reasonable physician in his position. See Jackson, 90 F.3d at 332.

If well-qualified experts disagree as to whether Dr. Saukhla chose a medically acceptable course of action based on the information available at the time, the risk of harm to Thompson of failing to inquire as to Thompson's mental status or

25

failing to order additional tests can hardly be said to have been "obvious" to a reasonable physician. <u>See</u> <u>id.</u> Dr. Saukhla is therefore entitled to qualified immunity as to plaintiff's § 1983 claim for deliberate indifference under the Eighth Amendment.

### 3. Officer Briggs

Finally, plaintiff has also failed to demonstrate that Officer Briggs' conduct violated clearly established law. Plaintiff, again relying on <u>Sandoval</u>, argues that Officer Briggs effectively "stood by" as Thompson suffered from what was obviously acute distress in transporting him back to his dorm, rather than taking some other action to treat his condition, such as calling 9-1-1. (<u>See</u> Pl.'s Opp'n at 10-11); <u>Sandoval</u>, 985 F.3d at 680. Plaintiff contends that any reasonable officer in Briggs' position would have realized that continuing to transport Thompson back to his room, "away from necessary medical treatment," after seeing that he was slipping out of his chair was constitutionally impermissible. <u>See</u> <u>id.</u>

Again, <u>Sandoval</u> is distinguishable from the case at hand. Not only did <u>Sandoval</u> involve the reasonableness of the actions of medically-trained nurses, as opposed to medically-untrained correctional staff, it did not concern a situation in which the defendant indisputably was acting pursuant to the orders of medical staff. <u>See</u> <u>generally</u> <u>Sandoval</u>, 985 F.3d at 657. Plaintiff does not identify a single case in which a court has held that a correctional officer must second-guess the representation of medical staff that an inmate-patient is medically cleared to return to his housing unit and call 9-1-1 or otherwise summon emergency medical care.

To the contrary, the Supreme Court has held that "clearly established federal law does not prohibit a reasonable officer . . . from assuming that proper procedures . . . have already been followed." See White, 137 S. Ct. at 552. Officer Briggs was therefore entitled to assume that proper medical procedures, including Nurse Portugal's medical clearance of Thompson just minutes before, had been followed. See id. Because plaintiff has failed to identify sufficiently specific constitutional precedents that would have alerted a reasonable officer in Officer Briggs' position that his conduct was unlawful, Officer Briggs is entitled to qualified immunity on plaintiff's claim for deliberate indifference under the Eighth Amendment.

For the foregoing reasons, defendants Portugal, Saukhla, and Briggs are entitled to summary judgment on plaintiff's first claim for deliberate indifference under the Eighth Amendment.

B. Plaintiff's State Law Claims

Because summary judgment will be granted on plaintiff's federal claim as to all three defendants against whom relief is sought, the court no longer has federal question jurisdiction, the alleged basis for federal jurisdiction in this case.[2] (See

---

[2] Plaintiff's operative complaint does not allege that diversity jurisdiction exists in this case. See generally SAC; see also 28 U.S.C. § 1332. Though plaintiff alleges that she is a resident of Ohio, she does not present allegations related to the citizenship of defendants Saukhla, Portugal, Briggs, Kibriyaa Taajwar, or Austin Shuntay Williams. (See SAC ¶¶ 7-17.) The court is therefore unable to find that one of the two necessary prerequisites for diversity jurisdiction, complete diversity of citizenship among the parties, is met in this case. See Fifty

SAC ¶¶ 4-5.)  Federal courts have "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).  But a district court "may decline to exercise supplemental jurisdiction. . . [if] the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c); see also Acri v. Varian Assocs., Inc., 114 F.3d 999, 1001 n.3 (9th Cir. 1997) (en banc) (explaining that a district court may decide sua sponte to decline to exercise supplemental jurisdiction).

The Supreme Court has stated that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine--judicial economy, convenience, fairness and comity--will point toward declining to exercise jurisdiction over the remaining state-law claims." Carnegie- Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988).

Here, comity weighs in favor of declining to exercise

Associates v. Prudential Ins. Co. of Am., 446 F.2d 1187, 1190 (9th Cir. 1970) ("The prerequisites to the exercise of jurisdiction are specifically defined.  They are conditions which must be met by the party who seeks the exercise of jurisdiction in his favor.  He must allege in his pleading the facts essential to show jurisdiction.  If he fails to make the necessary allegations he has no standing." (quoting McNutt v. Gen. Motors Acceptance Corp. of Indiana, 298 U.S. 178, 189 (1935)); Elshazi v. Dist. of Columbia, 415 F. Supp. 3d 20, 28 n.5 (D.D.C. 2019) (concluding that, although plaintiff "may have been able to may have been able to bring [his] case under the Court's diversity jurisdiction," because he had not invoked diversity jurisdiction or pled the citizenship of the defendants, he "ha[d] not established that complete diversity of citizenship exists").

28

supplemental jurisdiction over plaintiff's state law claims

against defendants for "Wrongful Death: Negligence/Malpractice"

and "Wrongful Death, Code Civ. Proc. § 377.60." (See SAC at 13.)

The state courts are fully competent to adjudicate such claims.

Some of plaintiff's claims raise peculiar questions of state

law.[3] Such questions are better left to California courts to

resolve.

As for judicial economy, plaintiff's state law claims

have not been the subject of any significant litigation in this

case. Judicial economy does not weigh in favor of exercising

supplemental jurisdiction. And finally, convenience and fairness

do not weigh in favor of exercising supplemental jurisdiction

over plaintiff's remaining state law claim. The federal and

state fora are equally convenient for the parties. There is no

reason to doubt that the state court will provide an equally fair

adjudication of the issues. There is nothing to prevent

plaintiff from refiling her state law claims against the

remaining defendants in state court,[4] and any additional cost or

---

[3] For instance, plaintiff's claim for medical malpractice against Nurse Portugal would require the court to address the question of whether plaintiff's retained expert, Dr. Field, is qualified to offer expert testimony. California law prohibits expert physicians from testifying as to the applicable standard of care for nurses in medical malpractice claims "absent some 'certification, expertise or relevant knowledge' of the applicable standard of care." Trujillo v. Cnty. of Los Angeles, 951 F. App'x 968, 972 (9th Cir. 2018). Because plaintiff's expert, Dr. Field, is not a registered nurse, the court would have to deal with the knotty issue of whether his experience working with and supervising nurses throughout his career would qualify him to opine on the applicable standard of care for Nurse Portugal in light of California case law.

[4] "[T]he period of limitations for any claim asserted under [28 U.S.C. § 1367(a)], and for any other claim in the same

delay resulting therefrom should be minimal. Accordingly, the court declines to exercise supplemental jurisdiction and will dismiss plaintiff's remaining state law claims without prejudice to refiling in state court.

IT IS THEREFORE ORDERED that defendants' motions for summary judgment (Docket Nos. 81, 83) be, and the same hereby are, GRANTED as to plaintiff's first claim for deliberate indifference to serious medical needs or serious risk of harm in violation of the Eighth Amendment under 42 U.S.C. § 1983. Plaintiff's remaining claims against defendants under California law are DISMISSED WITHOUT PREJUDICE to refiling in state court.

Dated: April 27, 2021

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE

action that is voluntarily dismissed at the same time or after the dismissal of the claim under subsection (a), shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period." 28 U.S.C. § 1367(d).